**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BILLIE L. BUMGARNER,                                     Case No. 1:14-cv-788
Administratrix with Will Annexed of the Estate of
On behalf of                                             Dlott, J.
Russell E. Lehman,                                       Bowman, M.J.

                Plaintiff,

       v.

FORD MOTOR GENERAL RETIREMENT
PLAN, et al.,

                Defendants.

**REPORT AND RECOMMENDATION**

Plaintiff Billie L. Bumgarner, proceeding as Administratrix on behalf of the Estate of

Russell E. Lehman, filed a complaint against Defendants under the Employee Retirement

Income Security Act of 1974 ("ERISA"), seeking to recover pension benefits that were

discontinued following Mr. Lehman's death.   After Plaintiff filed an amended complaint,

Defendants moved to dismiss claims for promissory estoppel, breach of fiduciary duty,

and breach of contract on grounds that those three claims were duplicative of, and barred

by, Plaintiff's claim for the denial of benefits under Section 502(a)(1)(B) of ERISA.   This

Court granted Defendants' motion in part.   (Docs. 29, 36).

Both parties have now filed cross-motions for judgment on Plaintiff's remaining

ERISA claim, based upon the administrative record. (Docs. 33, 38).   For the reasons that

follow, Plaintiff's motion should be granted, and Defendants' motion should be denied.

**I.  Findings of Fact**

Plaintiff filed suit to recover pension benefits under the Ford General Retirement

Plan Appendix L and a related "election kit." ("the Plan")(Doc. 15 at ¶4).   After Mr.

Lehman retired from his employment with Ford, he began receiving an annuity under the Plan that reflected joint and survivorship benefits.   Mrs. Lehman died in January 2013. In April 2013, Mr. Lehman notified Ford that he was cancelling his surviving spouse benefits due to his new status as a widower.

In response to that notice, Ford sent Lehman a cancellation of surviving spouse benefits form, which he returned to the Ford National Employee Services Center ("FNESC").  (Doc. 33, PageID 508).  FNESC, based in Dallas, Texas, processed the form on April 18, 2013.   By letter dated April 23, 2013, FNESC acknowledged Lehman's change in status to "single" and calculated a new monthly benefit amount based upon Lehman's "Drop of Survivorship Coverage."   (Doc. 33, PageID 512).   The April 23, 2013 letter reflected that Lehman's new annuity amount of $1,732.08, an increase over the prior annuity of $1,645.48, would take effect on or about May 1, 2013.[1]

Two days later, on April 25, 2013, Ford (through a related entity) mailed out to Mr. Lehman a 35-page lump sum buy-out election packet, offering "a new opportunity to take the *remaining value* of your General Retirement Plan (GRP) pension benefit as a single lump sum payment."  (Doc. 33, PageID 515, emphasis added).   The packet listed the lump sum calculation as "$170,128.65 as a one-time payment." (Doc. 33, PageID 522). The cover letter to the packet stated, "**If you take no action, you will continue to receive your monthly pension benefit payments as you do now.**"  (*Id.*, emphasis original).

---

[1] The record reflects a minor discrepancy in whether the new annuity would take effect on June 1 or on May 1, but the parties agree that the cancellation form and/or Plan provisions provide for a May 1 start date. The minor discrepancy is not material to the issues presented herein.

Unlike the cancellation of survivorship form previously processed by FNESC, the election kit was mailed to Lehman from an entity identified as "Ford Motor Company, Pension Lump Sum Information Center." (hereinafter "the PLSIC")(Doc. 33, PageID 516).[2]   A paragraph set off by the heading "If You Have Questions" urges the recipient to contact the PLSIC at a toll-free number (different from the FNESC number) during designated hours.   All forms were required to be returned to the PLSIC's address in Hopkins, Minnesota. (Doc. 33, PageID 519).   Defendants represent in their memorandum in opposition to Plaintiff's motion for judgment that the PLSIC was "a center created by the Committee for purposes of implementing the lump-sum program."   (Doc. 40 at 7, PageID 1050).

Three forms included in the election kit were required for a lump sum election:   (1) Form 1 – Benefit Election; (2) Form 2- Payment Direction; and (3) Form 3 – Waiver of Survivor Benefit.   Directions to Form 1 required the applicant "to confirm that your personal data is correct," by verifying and completing "the Declarations under Section 3" as well as "Section 6" of Form 1.   (Doc. 33, PageID 517).   The instructions in the election packet stated:

> Note that it's important to verify your personal data, as certain types of personal data may change the value of your benefit.  **If information is inaccurate, please contact the Pension Lump Sum Information Center.**

(Doc. 33, PageID 517, emphasis original).   Page 14 of the packet contains specific instructions for Form 1, including the following boxed area:

---

[2]In the R&R filed on March 10, 2015, the undersigned wrote: "FNESC mailed out lump sum buy-out election packets."   (Doc. 29 at 2).   However, that R&R, written in the context of a motion to dismiss, drew solely from the allegations of the amended complaint.   Prior to the filing of the current cross-motions, the Defendants never alerted the Court that any entity other than FNESC was responsible for the preparation of the election packets.

---

If You Have Questions or Need to Make Corrections to Personal Information

Contact the **Pension Lump Sum Information Center** at 1-888-382-9642 (or 1-858-703-2176 if calling from outside the United States and Canada) between 9 a.m. and 6 p.m. Eastern Time Monday through Friday. Note that the Pension Lump Sum Information Center is closed on New York Stock Exchange holidays.

If you have corrections to personal information, a new Election Kit may be required.

---

(Doc. 33, PageID527, emphasis original).  Immediately below the boxed area is the following language:

> **Important Notice**
>
> Calculations detailed on this statement estimate the pension benefit you may receive under the lump sum payment opportunity based on present plan provisions and the assumptions shown. These calculations are subject to corrections for errors in your record or otherwise. If this estimate varies from your actual benefit, the applicable plan document and plan rules will control the final determination concerning your benefits under the plan.
>
> Your employee benefits are governed by the terms of the applicable official plan document or policy. Summaries of your benefits are available; however, if a conflict exists between any summary and the official plan document, the official plan document prevails.

(*Id.*).

The Declarations relating to personal information required Lehman to verify his name, address, date of birth, and marital status.  (Doc. 33, PageID 525).  On a page listing the amount of the prospective lump sum, the election packet stated:

> The lump sum payment option was calculated as of October 1, 2013. If you elect the lump sum payment option, you will receive your last monthly pension benefit payment in October, and you will receive your lump sum payment as soon as administratively practicable, generally 75 to 90 days following July 29, 2013, which is the end of your election period.

4

(Doc. 33, PageID 522).    Based on the above language, distributions would "generally" be expected on or before November 1, 2014.

In order to make the election for a lump sum benefit, participants were required to complete, sign, and return the election kit forms by a deadline of July 29, 2013.    Lehman completed and sent in the first election kit more than a month prior to the deadline, on or about June 27, 2013.    The packet was stamped "Received" by PLSIC on July 1, 2013. (Doc. 33, PageID 557).    Consistent with his earlier cancellation of survivorship benefits, Lehman confirmed his widower status in the personal information section.    (Doc. 33, PageID 554, checking "divorced or widowed" box).    In the area of Form 1 that asked him to confirm the date of birth of his spouse, Lehman handwrote: "deceased 1/10/13, see attached death certificate."[3]    (*Id.*, PageID 555).

After receiving Lehman's first election kit, the PLSIC determined that the listed lump-sum calculation amount ($170,128.65) was inaccurate.    Defendants state that the inaccuracy was the result of a calculation by PLSIC that failed to account for Lehman's earlier cessation of survivor benefits.

Defendants did not send any type of correspondence to alert Lehman of the error in his first election kit.    Instead, unaccompanied by any cover letter, instructions, or explanation of any kind, the PLSIC mailed a second election kit on July 10, 2013 that contained a new figure on the page reflecting Lehman's single life lump sum payment. (Doc. 33, PageID 570-PageID 604).    Although the second kit did not indicate it was "revised" or "amended," close scrutiny would have revealed that the lump sum figure

---

[3]Instructions directed the applicant to submit a death certificate if "married when you started your present monthly pension benefit and your spouse has since died," unless the death certificate "was previously provided."    (Doc. 33, PageID 518). Although Lehman had already provided a copy of the death certificate to FNESC in April 2013, he provided an additional copy with his election kit.

listed in the second kit was $157,581.87, or $12,545.78 less than the lump sum previously listed in the first election kit. The second kit also listed a new "deadline" of August 28, 2013. Last, on page 7 of the otherwise identically worded 35-page kits, the second kit listed Plaintiff's "present" monthly benefit as a "Single Life Benefit" of $1,732.08 in place of the amount listed in the first kit as "$1,645.58" reflecting a "65% Joint & Survivor Benefit."

Despite the modest differences, both the first and the second election kits contained identical language regarding joint and survivorship monthly benefits, showing a benefit to a spouse under option 3 of $943.06 and, under option 4, a benefit to a spouse after death of $1,061.63 (Doc. 22, PageID 579-580). Both first and second kits also contained the same language asking Lehman to "verify that my spouse's date of birth is June 6, 1933." (Doc. 33, PageID 582). Finally, identical to the first kit, the second kit instructed Mr. Lehman to "COMPLETE AND RETURN (IF MAKING A CHANGE)."

Shortly after the PLSIC mailed the second kit to Lehman on July 10, on July 15, 16, 24, and 25, 2013, a PLSIC representative called Mr. Lehman's cell phone and left four messages seeking a return call. The first two messages stated that "we have new information we need to relay."[4] (Doc. 33, PageID 503; *see also* Doc. 40, Exhibit B). The second two messages merely asked Lehman to return the representative's calls. The cell number used by the representative was the number listed in Lehman's records. Lehman did not return any of the calls and stated in a subsequent letter that the number

---

[4]In Plaintiff's motion for judgment on the pleadings, Plaintiff asserts that "no call log has been produced" and that "[n]o documents have been provided that show attempts to contact Mr. Lehman." (Doc. 37 at 10, 16). However, Defendants have produced evidence that they provided Plaintiff's counsel with a copy of the call log on May 28, 2014. (Doc. 40, Ex. B). The call log was not included in the administrative record but Plaintiff never sought to include it. Defendants' exhibit is considered herein to the extent that both parties rely upon it.

had ceased to be a valid way to contact him.[5]  (Doc. 33, PageID 466). Lehman did not sign and mail back the second election kit prior to the August 28, 2013 deadline stated in that kit.

Plaintiff continued to receive his single life annuity payment from May 2013 through October, 2013.  Based upon the language in the first kit that he had timely returned, Lehman anticipated receipt of his lump sum conversion on or about November 1, 2013.  After he instead received a November 1 annuity payment, on November 4, 2013, his daughter telephoned Ford to inquire about Lehman's failure to receive the lump sum payment.  During that telephone call, Lehman and his daughter, Janet Wessel, were informed for the first time that the first election kit had been deemed ineffective, but that "if they would still like to do the lump sum then they would have to submit an appeal letter along with the completed [second] election kit."   (Doc. 15 at ¶22).

That same day, November 4, 2013, Lehman immediately signed and tendered the second election kit to PLSIC with a letter requesting an extension of time for returning the second kit.   In a letter directed to the "Appeals Board" of the PLSIC in Hopkins, Minnesota, Lehman admitted prior receipt of the second kit, but explained that he did not execute new forms because he assumed the amount would be automatically adjusted based upon his first packet.   "I did not realize this revised packet had to be returned in order to receive the benefit.   I thought the revised amount would be adjusted based on the information sent in the first packet."  (Doc. 33, PageID 466).   Lehman's November 4, 2013 letter provided a new cell number for his daughter as well as a copy of his Power of Attorney authorizing all matters to be discussed with her.

_____
[5]Mr. Lehman apparently suffered from deafness and rarely if ever used his cell phone.

7

The PLSIC did not respond.  Instead, on January 17, 2014, FNESC in Dallas, Texas issued a written "Claim Denial Letter" in response to Lehman's November 4, 2013 "appeal," stating that "your claim is denied" based upon four specific Plan provisions: Appendix L, Section 1(C)(1), (C)(2), (C)(3), and (C)(4).

Section 1(C)(1) states that an eligible Member "must submit a completed and signed election form in such manner as may be required by the Committee."  Section 1(C)(2) provides that an election "shall not be effective unless a completed and signed election form is received by the Company before the expiration of the lump sum window election period."  Section 1(C)(3) states that "if a Member…has not submitted a completed and signed election form under the lump sum window by the expiration of the lump sum window election period, then the Member shall be deemed to have declined to make an election under the lump sum window."  Last, the letter cited section 1(C)(4) to the extent that provision states an election "shall be effective only if the Committee does not reject the Member's application under the lump sum window."

FNESC's January 17, 2014 letter states in relevant part:

Your election period was from May 1, 2013 through July 29, 2013.  Due to changes required to your original calculation, the original lump sum election kit that you received was deemed invalid.  A revised kit was mailed to and received by you, and a 30-day extension to the original deadline was provided for you to make an election.  Because of your failure to respond before your election period ended, you were deemed to have declined to make an election under the Lump Sum Window.

(Doc. 15-3, Exhibit number 107, Doc. 33, PageID 488).  The letter concludes by informing Lehman of his "right to appeal to the General Retirement Committee."  (Doc. 33, PageID 488).

8

On February 19, 2014, Lehman died. Following Lehman's death, and based upon the determination that the first election kit was "deemed invalid" to elect a lump sum, Lehman's pension benefits were discontinued. On February 26, 2014, Lehman's estate sent a notice of his death and intent to appeal. On June 16, 2014, Plaintiff filed a formal appeal to the Committee on behalf of Lehman's estate. By letter dated July 29, 2014, the Committee denied that appeal. (Doc. 33, PageID 497, 502-506). The Committee's denial letter reiterated the reasons previously stated in the January 2014 letter from FNESC, but added that "Mr. Lehman's election was rejected in order to preserve the [plan's] qualified status, as required by Code §1001(a) and 417…as permitted under Appendix L, Section 1(C)(4) of the [plan]." (Doc. 33, PageID 503).

Plaintiff filed suit against: (1) the Ford General Retirement Plan Committee members as Plan Fiduciaries ("the Committee"); (2) FNESC; and (3) the Plan itself. The PLSIC is not identified as a party to this lawsuit.[6] Plaintiff's amended complaint asserted entitlement to recovery under multiple theories, including: (1) promissory estoppel based upon the representation to Lehman that he would receive a lump sum payment of $170,128.65; (2) breach of fiduciary duty; (3) wrongful denial of benefits under 29 U.S.C. §1132(a)(1)(B); and (4) breach of contract. This Court granted Defendants' motion to dismiss, finding persuasive the argument that "three of Plaintiff's claims (breach of fiduciary duty, promissory estoppel and breach of contract) are barred as a matter of law, because Section 502(a)(1)(B) of ERISA would provide identical relief." (Doc. 29, adopted Doc. 36). The Court reasoned that "Plaintiff's claims for equitable relief [under

---

[6]Plaintiff complains that the Defendants first identified the PLSIC in the pending dispositive motions. The undersigned agrees that the timing of the identification for the first time in the pending motions is troubling. Further, aside from Ford's statement in its brief that the PLSIC was "a center created by the Committee," the record is devoid of any information concerning that entity.

the catchall provision of §1132(a)(3)] … are not 'appropriate' due to the availability of an

'adequate' remedy under §1132(a)(1)."   (*Id.*).

## II.  Analysis

### A.  Standard of Review:   Arbitrary and Capricious or De Novo

The parties have filed cross-motions for judgment under the procedure outlined in

*Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609 (6th Cir. 1998).   Plaintiff argues that a

de novo standard of review should apply to the denial of Lehman's claim in this case,

whereas Defendants advocate for review under the "arbitrary and capricious" standard.

Under ERISA §502(a)(1)(B), a court may reverse an administrator's decision to deny

benefits only if that decision was "arbitrary and capricious" if the decision was made

pursuant to a plan that "gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan."   *McClain v. Eaton*

*Corp. Disability Plan*, 740 F.3d 1059, 1063-64 (6th Cir. 2014)(internal quotation marks

and citations omitted).   Here, the Plan expressly states:

> The Committee shall have discretionary authority to administer the benefit
> structure of the Plan, and to this end may construe and interpret the Plan,
> and may correct any defect or supply any omission or reconcile any
> inconsistency in such manner and to such extent as it shall deem expedient
> to carry out the purpose of the Plan.   It shall not, however, take any action
> not uniformly applicable to all employees similarly situated… Benefits under
> this Plan will be paid only if the Committee decides in its discretion that the
> claimant is entitled to them.

Plan, Art. XIII §2, (Doc. 33 at PageID 713).

Based upon the delegation of discretionary authority in the Plan to the Committee,

Defendants argue that the arbitrary and capricious standard applies. Defendants cite to

other cases involving application of the "arbitrary and capricious" standard to the same or

10

similar Ford Plans. *See e.g., Donati v. Ford Motor Co., Gen. Ret. Plan Comm.*, 2015 WL 2405613, at *3 (E.D. Mich., May 20, 2015)(applying arbitrary and capricious standard, but holding that decision would be affirmed even under de novo standard); *Frisky-Watson v. Ford Motor Co.*, 2015 WL 4496291, at *1 (N.D. Ohio July 23, 2015)(applying arbitrary and capricious standard); *Dobrski v. Ford Motor Co.*, 2015 WL 1880378, at *1 (N.D. Ohio Apr. 24, 2015)(same).

Defendants' position presumes that the Committee made all relevant decisions to deny Plaintiff's claim in accordance with the Plan provisions. However, Plaintiff argues that: (1) the "de novo" standard applies because a "non-authorized entity" made the relevant adverse decisions rather than the Committee; and (2) the decisions were not made in accordance with Plan provisions. For example, Plaintiff alleges that it was FNESC that rejected Lehman's first election kit on January 14, 2014 and refused his request for an extension of time to submit the second election form, and FNESC is not given fiduciary discretion in the Plan. *See Sanford v. Harvard Indus.*, 262 F.3d 590, 597 (6th Cir. 2001)(holding de novo standard applies where proper Plan procedures not followed and a body without authority revoked an employee's benefits).

Defendants respond first by asserting that Plaintiff has made an error of fact, because it was not FNESC, but the PLSIC, that prepared,[7] sent, and subsequently rejected Plaintiff's first election kit. (Doc. 40 at 7, citing PageID 515-516, 571-572). Defendants further argue that PLSIC and/or FNESC acted only in a ministerial capacity,

---

[7]Despite its contention that it was the separate entity of the PLSIC that prepared the election kits, Defendants also variously assert that it was "the Committee" that sent the lump-sum election kit, and "the Committee" that "determined that the kit required modification" and "sent Mr. Lehman a new election kit." (Doc. 38-1 at 6; *see also* Doc. 38-1 at 8, referring to "the Committee, via the NESC" and "the Committee, via Ford's Pension Lump Sum Information Center").

in accordance with the Committee's properly exercised discretionary authority, such that the arbitrary and capricious standard remains applicable.

Contrary to Defendants' view, the undersigned concludes that a "de novo" standard should apply on the facts presented, because the PLSIC and/or FNSEC operated beyond merely "ministerial" duties as a functional fiduciary. Alternatively, the undersigned concludes a de novo standard of review applies because the Committee completely abdicated its statutory fiduciary duties and made decisions that violated express Plan language. Even if a reviewing court were to disagree and apply a more deferential standard of review, the undersigned concludes that the Defendants' claim denial was so unreasonable on the facts presented that it should be reversed as arbitrary and capricious. *Compare e.g., Thompson v. JC Penney Co., Inc.*, 2001 WL 1301751 (6th Cir. Aug. 7, 2001)(applying de novo standard where the administrator failed to provide adequate interpretation of the Plan in response to Plaintiff's claim that he continued to be enrolled in the Plan).

### 1.  The Decision-maker(s) and Fiduciary Authority

To determine the applicable standard of review one must first decipher: (1) which entity made the decision to deny Lehman's claim; and (2) if other than the Committee, was the entity authorized by the Committee to exercise fiduciary discretion to determine eligibility?  *Sanford v. Harvard*, 262 F.3d at 597; *Shelby County Health Care Corp., v. Majestic Star Casino, LLC*, 581 F.3d 355, 365 (6th Cir. 2009) (citing *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 229 (2nd Cir. 1995)("The factual issue of who actually made the benefit determination must be resolved before a court can properly decide whether or not to uphold the pension determination.").

12

### a. The Role of the PLSIC

The administrative record confirms that both the first and the second lump sum election kits were prepared and sent by the PLSIC, not FNESC or the Committee.[8] Plaintiff timely returned his first election kit to the PLSIC as instructed. Following receipt of Lehman's executed forms, it was the PLSIC that made the decision to "deem[] invalid" or "reject" the first kit, and to send Plaintiff a second election kit in July 2013. Defendants assert that "the PLSIC determined that a second election kit was required" based upon the determination by the PLSIC that the first kit returned by Lehman "included an outdated lump-sum amount." (Doc. 40 at 12). The PLSIC provided no notice to Lehman that his first kit contained an error, or that it was being rejected based upon any error in the lump sum calculation. The PLSIC also did not provide notice of the purpose of the duplicative second kit. The second kit did not contain any language that it was "amended" or "revised," or that signing and returning the forms within it was "required" by Lehman to effect his election despite his prior timely submission of the first kit.

### The Calculation of the Lump Sum in the First Kit

Defendants admit to no error on the part of PLSIC or any Defendant in the inclusion of the erroneous lump sum figure in the first kit. Instead, Defendants maintain that the figure was accurate at the time the first kit was mailed at the end of April, notwithstanding the prior cancellation of Lehman's survivorship benefits, because Lehman's new monthly annuity payment was not scheduled to take effect until May 1, 2013. Defendants argue that there was no material misrepresentation in the lump sum

---

[8]Plaintiff suggests that this Court already has determined that FNESC operated as a "functional fiduciary." While the undersigned reaches that conclusion in this R&R, the Court previously held only that it was *possible* that FNESC was a functional fiduciary, based on the allegations of the complaint and limited scope of review in the context of the then-pending motion to dismiss.

amount by the PLSIC because the election kit informed participants that corrections to the lump sum estimates could be required based upon any changes in personal information.

Plaintiff protests that the calculation of the lump sum figure in the first kit was in violation of clear Plan language and therefore beyond any ministerial authority possessed by FNSEC or the PLSIC. Regarding the calculation of the lump sum stated in the first kit, the "Lump Sum Windows" section of the Plan sets forth the computation to be:

> 1. …an amount equal to the Actuarial Equivalent lump sum value of the remaining monthly benefits payable, including the following, if applicable:
>
>> (i)   Life Income Benefit:
>> …..
>> (v)   cancellation of survivorship coverage upon death of spouse.

Appendix L, D.1.   (Doc. 33, PageID 934-935).

The undersigned agrees that the above Plan language required Defendants to transmit to Plaintiff in the first election kit an accurate lump sum figure that reflected the previously processed (as of April 18, 2013) cancellation of survivorship coverage form received by FNSEC. The undersigned further finds that Plan language required the lump sum to reflect (i.e., "shall be") the "value of the <u>remaining</u> monthly benefits payable," which does not comport with Defendants' position that they have no blame in the miscalculation. The fact that Lehman had notified Defendants of his wife's death and had transmitted the cancellation of survivorship forms so close in time to the mailing of the election kit makes the Defendants' computational error understandable,[9] particularly in

---

[9]In response to Lehman's telephone inquiry of November 4, 2013, an FNESC representative "explained that *during the election window, the Pension Lump Sum Information Center was notified* that his monthly benefit had changed…to a single life form of benefit."   (Doc. 33, PageID 495).   Of course, Lehman himself had notified Defendants (and Defendants had acknowledged that notice) prior to May 1, 2013.

view of the fact that FNESC and the PLSIC are different entities, but those circumstances do not permit Defendants to shift the blame for their error to Lehman.[10]

### The Decisions to Reject the First Kit and Send a Second Kit

The PLSIC's initial role in sending out the first election kit, including its miscalculation error, can be characterized as "ministerial." However, subsequent decisions to reject Lehman's kit and to send him a new kit, without any notice of those decisions, went beyond a "ministerial" role.

Defendants maintain that the PLSIC stayed within a "ministerial" role because it acted in accordance with "the Committee's [discretionary and unwritten] rule that only accurate lump-sum election kits are valid" and "would be accepted." (Doc. 40 at 8, 21). According to Defendants, the Committee alone retained authority to determine whether Plaintiff's subsequent claim for benefits should be paid or denied. (*Id.*; *see also Doc. 33,* PageID 713-714 (Plan grant of general discretionary authority to Committee), PageID 502-506 (July 29, 2014 Committee denial of appeal)). Plaintiff argues that the Committee's alleged "secret, non-disclosed rule" to require rejection of any kit containing any error in the stated lump sum is not supported by the terms of the Plan, and was never timely communicated to him.

The undersigned concludes that the PLSIC's action in rejecting Plaintiff's first election kit amounted to an action by a functional fiduciary who lacked authority under the Plan provisions. *Accord Wintermute v. The Guardian*, 524 F. Supp.2d 954, 959-960 (S.D. Ohio 2007).

---

[10]As in *Fife*, discussed *infra,* a different outcome might have resulted if Lehman had failed to timely notify Ford of his wife's death and/or failed to cancel his survivorship benefits prior to the mailing of the first election kit.

### b.  The Role of FNESC in the Claim Denial Decision

For similar reasons, the undersigned concludes that FNESC's January 17, 2014 "Claim Denial Letter," which was the first written communication denying Plaintiff's request for an extension of the deadline to submit the second kit, as well as the first clear written rejection of the first election kit and Plaintiff's claim for lump sum benefits, went beyond a "ministerial" application of any Committee "rule."   Therefore, FNESC also is considered as a functional fiduciary.   However, even if Defendants' view of the record is accepted and the referenced "rule" existed and/or was properly adopted by the Committee (both of which Plaintiff disputes, and for which there is no explicit support in the record), any enforcement of such a rule was clearly unreasonable under the circumstances presented here.   Thus, neither the PLSIC nor FNESC had authority under the Plan or were authorized to formally reject Lehman's first election kit without notice, or to deny his timely submitted claim.

To the extent that the Committee confirmed those decisions in its denial of Plaintiff's final appeal in July 2014, the Committee was equally without authority to "rubber stamp" the decisions by FNESC and/or the PLSIC that Lehman's first election kit was "deemed invalid" and that his second kit was untimely.   *See McDonald v. Wester-Southern Life Ins. Co.*, 347 F.3d 161 (6th Cir. 2003)(holding that a named fiduciary cannot "rubber stamp" the decisions of a functional fiduciary).   Last but not least, the Plan granted the Committee discretion only insofar as it conformed with the Plan, including but not limited to the duty to apply Plan provisions "uniformly…to all employees similarly situated."   (Doc. 33 at PageID 713).

### 2.   Fiduciary Standards Support De Novo Standard

Even if the Plan language could be read to be consistent with Defendants' position, a conclusion the undersigned cannot reach, Plaintiff argues that a de novo standard should still apply, because the Plan does not afford unlimited discretion to disregard standards required of all fiduciaries under ERISA.   Under *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S. Ct. 2459, 2465-2468 (2014), the statutory fiduciary duty provisions of 29 U.S.C. §1104(a) "control over the Plan language," and require "the duty of loyalty, the prudent person fiduciary obligation, and the exclusive benefit rule." (Doc. 37 at 4). Plaintiff maintains that the arbitrary and capricious standard cannot be blindly adopted regardless of which entity (the Committee, or FNESC, or the PLSIC) made the decision to deny his claim, unless the Court first finds "compliance with all of the fiduciary statutory provisions…." (Doc. 37 at 5).   Plaintiff contends that on the record presented, neither the Committee nor the entities it controlled fulfilled their fiduciary duties, thus requiring a more rigorous "de novo" standard of review.

Defendants counter that Sixth Circuit law supports the application of the "arbitrary and capricious" standard without any "preliminary inquiry into whether plan fiduciaries have fulfilled their fiduciary duties, citing *McClain v. Eaton Corp. Disability Plan,* 740 F.3d 1059 (6th Cir. 2014).   However, in *McLain,* the Sixth Circuit did not consider the relevant standard other than noting that the parties agreed that the arbitrary and capricious standard applied.   *Id.*, 740 F.3d at 1064.

The undersigned concludes that – at least to the extent that discretion to violate the ERISA statute may not granted – the underlying statutory fiduciary duties of ERISA support a de novo standard of review.   The Supreme Court confirmed in *Dudenhoeffer*

17

that the same prudence standard applies to all ERISA fiduciaries.   Thus, the Ford Plan fiduciaries must adhere to statutory fiduciary standards, regardless of Plan language. The Sixth Circuit confirmed the application of statutory fiduciary duties in *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999), including a duty to inform that includes conveying "information about which the beneficiary did not specifically inquire" in some cases.   *Id.*, at 549 (holding that duty to inform "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.").   *Accord In re Cardinal Health, Inc. ERISA Litigation*, 424 F.Supp.2d 1002, 1018 (S.D. Ohio, March 31, 2006)(explaining that the Sixth Circuit has enumerated three general duties of pension plan fiduciaries, including a "duty of loyalty," "prudent person" obligation, and the duty to "act for the exclusive purposes" of providing benefits). "Fiduciary status is a 'fact intensive inquiry'…."   *Id.*, at 1030.   Thus, applicable statutory fiduciary standards support the application of a "de novo" standard of review, notwithstanding the Plan language that otherwise grants discretion to the Committee.

One additional aspect of Defendants' argument warrants comment.   Plaintiff has alleged that Defendants deprived him "of his due process rights by failing to comply with the claim process."   Defendants argue that because that allegation was part of a breach of fiduciary duty claim that the undersigned dismissed, it should not be considered as a "recycled" version of a previously dismissed claim.

However, the March 10, 2015 R&R dismissed three of Plaintiff's claims because the undersigned found them "duplicative" of the §502(a)(1) claim.   *See also Donati*, 2014 WL 3663966 at **3-4.   The undersigned held that Plaintiff's claim for breach of fiduciary duty was subsumed by the existing §502(a)(1) claim on the record presented.   (*See also*

18

Doc. 34 at 5, argument by Defendants that Plaintiff's equitable claims seek the same relief).   In dismissing the breach of fiduciary duty claim, the undersigned relied in part on *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 841 (6th Cir 2007)("if the plaintiff had alleged that the claims administrator had breached its fiduciary duty by wrongfully denying benefits, the claim would have been duplicative"). (See Doc. 29 at 7).   *See also Rochow v. Life Ins. Co. of North America ("Rochow II")*, 2015 WL 925794 (6th Cir. 2015).   Notwithstanding the dismissal of a duplicative claim, Defendants' fiduciary duties may be considered within the context of Plaintiff's remaining §502(a)(1) claim.

### B.   The *Fife* Decision

Explicit Plan language requires the Committee not "to take any action not uniformly applicable to all employees similarly situated."   (Doc 33 at PageID 713).   Both parties cite a recent and factually similar case, *Fife v. Ford Motor Co.*, 2015 WL 6467626 (E.D. Michigan, October 27, 2015).   Like Lehman, Mr. Fife was a retired pensioner under a Ford Plan who attempted to make an election to receive a lump-sum payment of his remaining benefits in lieu of a continued annuity.   Like Lehman, Mr. Fife completed an election form that included an inaccurate lump sum figure, based upon Ford's erroneous belief that Fife's wife (who had been entitled to survivorship benefits) was still living.   In reality, Fife's wife had passed away more than a year prior to the election kits being mailed out, in September 2011.   However, unlike Lehman, Fife made no timely attempt to notify Ford of that fact through submission of a death certificate or cancellation of his survivorship benefits.

19

Ford sent Fife an election kit in November 2012. The election kit instructed Fife to call immediately to make any corrections to personal information, and further stated that a "new election kit may be required." However, unlike the instant case, Fife's election kit explicitly stated that if a new election kit were required, the participant "may be moved to a later election period." *Id.* at *3. On February 5, 2013, Fife executed and returned the forms contained in his first kit, notifying Ford for the first time that he was "widowed."

Upon learning that Fife's wife had died more than sixteen months earlier, the Committee formally and explicitly rejected Fife's election in writing. By letter dated February 28, 2013, the Committee explained that "the lump sum pension calculation you originally received was based on a benefit payable for both you and your spouse's lifetimes," and that "a correction …is required." *Id.* at *5 (emphasis added). The letter further stated: "To ensure you have time to make an informed decision, you have been moved to a later election period." The letter informed Fife he was "no longer part of the election period previously communicated…." *Id.* Sadly, Fife passed away on February 22, 2013, prior to his receipt of the rejection letter.[11] Based on the timing of his death, he was not able to participate in the later election period and his benefits were terminated prior to his ability to receive a lump sum payment.

Fife's Estate filed suit, arguing that Ford had made an offer in the first kit, and that Fife's acceptance in the first kit was binding on Ford. The Estate argued that even if the Committee reasonably had rejected the first kit, the Committee unreasonably later refused to pay the correct lump sum amount, because the Committee "should have treated Fife's attempt to elect the inaccurate lump-sum as a clear indication that he would

---

[11]Ford had no knowledge of Fife's death at the time it mailed him the correspondence rejecting his first attempted election, and advising him that he was required to complete a second election kit. *Id.* at n.2.

have (or even intended to) elect the correct lump-sum amount." *Id.* at *6. The district court rejected the plaintiff's position. The court held that Ford's rejection of the first kit was reasonable, because the first kit also included an erroneously low listing of Fife's annuity, and the Committee "had no way to know with certainty whether Fife would have elected the corrected lump-sum if he had known that he was entitled to a larger monthly benefit payment." *See id.*, 2015 WL 6467626 at *6.

Defendants' reliance upon similar reasoning in opposition to Plaintiff's motion for judgment is somewhat less convincing here, in part because it contradicts Defendants' arguments in support of their earlier motion to dismiss. In seeking dismissal of Plaintiff's claim for promissory estoppel. Defendants argued vigorously that the relatively small discrepancy of $12,500 between the lump sum calculations provided in the first and second election kits was not a "material" misrepresentation on which any claim could be based, because the record clearly showed that Lehman "would have elected the same option anyway, notwithstanding the change in the precise calculation." (Doc. 17 at 17). Indeed, unlike Fife, Lehman already knew the amount of his larger monthly single life annuity when he returned the first election kit.

Other more critical facts also distinguish the instant case from *Fife* and lead to a different result. First, the *Fife* decision discusses only the "Committee" and Ford. All decisions were referenced as by the "Committee" as an authorized fiduciary, and there is no discussion of what if any decision-making role was undertaken by any other entity, whether PLSIC or FNSEC. The initial error in the first election packet was attributable to Fife, not to Ford, as the court emphasized with the heading "Fife Neither Completes the Plan's Cancellation of Surviving Spouse Benefits Form Nor Submits a Copy of Her Death

Certificate."   *Id.* at *2.   Additionally, in *Fife*, the Committee sent Fife a letter that clearly explained: (1) that his initial election forms were being rejected; (2) the precise basis for that rejection; (3) that Fife was being moved to a new election period so that he could consider whether he wanted to accept the corrected lump-sum payment amount in a new and revised election packet; and (4) that execution of new election forms was required.

By contrast, Lehman received no communication from PLSIC, FNESC, or the Committee to explain the basis for being sent a second election kit.   No cover letter accompanied the second kit, which was nearly identical to the first kit, including forms that Lehman had previously executed and mailed back to PLSIC as instructed.   Thus, unlike in *Fife*, Lehman received no notice that his initial election forms were being rejected or the basis for that rejection.   Also unlike *Fife*, Lehman was not informed that he was being moved to a new election period, and was not instructed that he must execute the new forms to make an effective election.   Arguably to the contrary, the instructions in the second kit directed Lehman only to "COMPLETE AND RETURN (IF MAKING A CHANGE)."   Thus, Lehman was not informed that the "manner prescribed by the Committee" for his election was anything other than his initial completion of the first kit. Considering that Lehman did not wish to alter the forms he had recently executed and returned on June 27, 2013, it is difficult to fault him for failing to complete the second kit. The second kit contained only modest changes, listing a new "deadline" of August 28, 2013, a new lump sum (without any highlighted or descriptive wording to alert Lehman that the sum had been revised or amended), and on another page, Lehman's current monthly annuity amount.

### C. A Fundamental Failure of Communication

Returning to the remaining arguments of the parties herein, the undersigned concludes that the lack of any communication rejecting the first election kit, and the mailing of the second election kit without any instructions or notice that it contained amended figures and was required to be returned in order to confirm Plaintiff's prior election, amounted to a material misrepresentation by the Defendants and led directly to an abuse of discretion in the denial of Plaintiff's claim. The unreasonableness of the Defendants' actions is highlighted when one considers: (1) the sole basis for the "outdated" sum in the first kit was error on the part of the PLSIC and/or a lack of communication between two entities created by the Committee (FNESC and the PLSIC) regarding Lehman's previously transmitted cancellation of survivorship benefits form; (2) the lack of any timely notice to Lehman concerning the erroneous lump sum in the first kit; (3) the lack of communication regarding the rejection of the first kit; and (4) the woefully inadequate notice concerning Lehman's need to complete a second kit. *Accord, Moore v. Layfayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006)(holding that courts should consider "all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances.").

Apart from the vague and unreturned telephone messages from a PLSIC representative left on Lehman's cell phone in July 2013, asking him to call regarding unspecified "information," Lehman did not receive so much as verbal notice of PLSIC's rejection of his first election packet until November 4, 2013, when Lehman's daughter called FNESC, to ascertain the reason why he had not received his lump sum payment as expected on or about November 1, 2013. Only then was Lehman belatedly informed for

23

the first time that his first election kit had been "deemed invalid" and that the return of a second kit was required. Lehman promptly sent an "appeal" letter to PLSIC, as well as the executed second kit, the same day. PLSIC did not respond; instead, FNESC responded with the first official notice of rejection – the January 17, 2014 "claim denial letter." (Doc. 33, PageID 487). In addition to rejecting Lehman's claim for lump sum benefits based upon the newly disclosed rejection of the first election kit, the January 2014 letter denied Lehman's request for an "extension of the deadline to make a decision regarding the lump sum opportunity" through submission of the second kit. The January 2014 denial letter by FNESC provided Plaintiff with notice of the right to "appeal to the General Retirement Plan Committee." It was not until July 2014, after Plaintiff pursued that appeal, that the Committee ratified FNESC's claim denial.

Arguing that the Committee acted reasonably, Defendants first rely on a lone sentence on page 14 (of 35) of the first election kit that a new kit "*may* be required" for changes in personal information. But the verb "may" is discretionary, with no suggestion that a new kit would be mandated. (Doc. 33, PageID 527, emphasis added). Considering that Lehman had promptly notified Ford of his wife's death *and* that his cancellation of survivorship benefits form was processed by FNESC prior to the mailing of the first election kit, it would have been more reasonable for him to assume that a new kit was not required. Additionally, the first kit stated that Lehman's lump sum benefits "estimate" had been calculated for "remaining benefits" as of "October 1, 2013," a date long after his return of the cancellation of survivorship benefits form and many months after his new annuity was to start.

For the Defendants to argue that not only that the inclusion of a single "may be required" phrase in the first kit should have led Lehman to anticipate the silent "rejection" of his first kit but additionally, to understand the necessity of promptly returning an apparently duplicative second kit, strains credulity.   Considering that Lehman did not want any change beyond the election he made in the first kit wherein he merely reiterated (rather than "changed") personal information conveying his widower status, his assumption that he did not need to return the second kit was reasonable.

Defendants' contention that the mere mailing of a second packet provided sufficient notice of the rejection of the first kit, and the necessity of completing a second kit, is equally unpersuasive.   The inferences that Lehman would have been required to draw were far too great.   The lack of any cover letter or written explanation that the first kit was being rejected, or why, left Lehman without any knowledge that his first kit had in fact been rejected.   Nor was it reasonable to expect Lehman to infer the basis for the duplicative kit being mailed to him, without any cover letter or writing to explain it.   On its face, the second kit required a return only if Lehman were making any "change" to his prior lump sum election.

To support an argument that Lehman actually drew the necessary inferences to constitute adequate notice, Defendants point to a statement in Lehman's November 4, 2013 letter, that he "thought the revised amount would be adjusted based on the information sent with the first packet."   Defendants assert the statement proves that Lehman "must have seen the correct, updated lump-sum payment amount in the second kit," and merely "erroneously believed that the amount would be adjusted."

25

The undersigned disagrees with this strained presumption.   Lehman's November 4, 2013 statement regarding his belief - that the final amount would be adjusted if necessary - is consistent with a fair reading of the "Important Notice" in the first election kit, stating that if the "estimate varies from your actual benefit, the applicable plan document and plan rules will control…."   (PageID 527). Thus Lehman's explanation, that he assumed that any "revised amount would be adjusted based on the information sent in the first packet," does not imply any actual knowledge that his first election kit was being rejected, or knowledge that he was required to complete and return a duplicative second kit despite the fact that he was not making any change.

The Committee alternatively argues that the fact that a Plan representative left messages on Mr. Lehman's cell phone that he had information to relay amounted to adequate notice, and that it was Lehman's failure to return those calls that led to the denial of his claim.   (Doc. 40 at 18).   Again, I disagree.   Even if the telephone messages had been received, none referenced the first or second election kits, the lump sum calculations, or any other relevant detail that would have alerted Lehman to the reason that the representative was requesting a return call.

In addition to failing to provide even verbal notice of the rejection of the first election kit (or need to return the second kit) until Plaintiff's daughter called FNESC to inquire about the missing lump sum payment, FNESC did not issue a written denial of Plaintiff's claim until January 17, 2014, a date well beyond the time period during which Plaintiff could have returned the second election kit.   Such notice of the rejection of the

first kit, and/or of the Committee's decision to require Lehman to execute and return the forms in the second kit, was woefully inadequate.[12]

As an alternative to arguing that the "notice" provided to Lehman was adequate, Defendants alternatively claim that no notice was required whatsoever prior to the January 2014 claim denial letter. Defendants concede that Lehman's November 4 request to extend the second election kit time period, and to receive the lump sum payment were decisions within the Plan's claim procedures. (Doc. 40 at 14, n.1). However, Defendants carefully parse out the earlier decisions, arguing that the determination that the first election kit should be "deemed invalid" and/or decision to require execution of a second election kit do not fall within the definition of a "benefits claim" decision. Defendants reason that the earlier decisions, despite being precursors to the claim denial, do not themselves constitute an "adverse benefit determination," such that the statutory notice provisions do not apply. *See* 29 C.F.R. §2560.503-1(g)(imposing obligation to "provide a claimant with written…notification of any adverse benefit determination."). Defendants take the same position in their motion for judgment, pointing out that in the final denial letter of July 2014, the Committee stated (for the first time) that "Mr. Lehman's election was not a claim for benefits but rather an invalid election of an optional form of payment" such that "the notice requirements…[do] not apply." (Doc. 38-1 at 14, citing PageID 504).

Defendants may not rely upon the uncommunicated rejection of Plaintiff's first election kit (based upon an equally uncommunicated Committee "rule") to support the

---

[12]Plaintiff argues that the Committee was required to provide notice of the rejection of Lehman's election kit prior to July 31, 2013, the end of the Lump Sum Window, and that the final rejection of his appeal on July 29, 2014 was untimely. The undersigned finds no need to reach this issue.

Defendants' denial of Plaintiff's claim for benefits, while claiming that no notice was required to alert Plaintiff that his first election kit was being rejected.  Even under the narrow standard of review advocated by Defendants, "the ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *McClain*, 740 F.3d at 1066.  The Plan provided for a lump sum election period, and the election kit was an integral part of the claim denial decision and of the Committee's exercise of its fiduciary duties to administer benefits in compliance with Plan provisions.

The Defendants' failure to send prompt written notification of the denial of Plaintiff's claim for "participation" in the lump sum election, when Defendants rejected Plaintiff's first election kit, also violated express Plan language that states that a member of the Plan "shall make a claim for benefits or participation by making a request in accordance with the Plan."  Article 13, Section 4.  The Plan goes on to state that if a claim for "benefits or participation is denied in whole or in part by the Plan Administrator, the Member will receive written notification within ninety (90) days…from the date the claim for benefits or participation is received…."   (Doc. 33, PageID 714).

Lehman's return of the first election kit was a claim for "participation" in the Lump Sum Period provided for by the Plan.   Therefore, I reject Defendants' characterization of Lehman's first election kit as merely "an invalid election of an optional form of payment" rather than a claim for participation or benefits.  (Doc.. 33, PageID 504).  *Accord Fife* (treating plaintiff's claim that the first election kit was effective as a "claim for benefits").

Ford had an ongoing duty to provide accurate information to participants.[13]   *See also*

*Robberson v. Access Business Group*, LLC, 2008 WL 2167986 at *4 (W. Dist. Mich. May

21, 2008)(construing "claim for benefits" broadly, and confirming an "obligation to provide

adequate notice in writing to any participant or beneficiary whose claim for benefits…has

been denied, setting forth the specific reasons for such denial, written in a manner

calculated to be understood by the participant and …afford[ing] a reasonable

opportunity…[for] a full and fair review by the appropriate named fiduciary of the decision

for denying the claim.").   *See also generally* 29 C.F.R. § 2560.503-1 ("For purposes of

this section, a claim for benefits is a request for a plan benefit or benefits made … in

accordance with *a plan's reasonable procedure* for filing benefit claims." (emphasis

added)).

### D.   The Second Election Kit Time Period Was Unreasonable

The undersigned has concluded that the de novo standard of review is

appropriate, but that the Defendants' decision should be reversed as wholly

unreasonable even under the arbitrary and capricious standard.   However, even if the

Committee had provided timely notice regarding the rejection of the first kit and clear

instructions to return the second kit, the undersigned would still find the Committee's

actions to have been in violation of Plan language, because the second election kit

afforded Lehman fewer than 60 days to make his election.

The Plan defines the full lump sum window as a period of time between August 1,

2012 through July 31, 2013.   (Doc. 33, PageID 933).   Plan language further specifies

---

[13]Plaintiff asserts that the SPD language also provides that if a claim "for benefits or participation is denied in whole, or in part, by the Plan Administrator, you will receive written notification…."   (Doc. 40-1, PageID 1108, emphasis added).   If Plaintiff's separate claims based upon the SPD had not been waived, this argument might be more persuasive.

that the Committee retains "discretion to modify the Lump Sum Window dates specified herein to the extent administratively required but in no event shall any Lump Sum Window exceed 12 months in duration." (Doc. 33 at PageID 936). The Plan defines any lump-sum election period as "a consideration period assigned to a Lump Sum Window Eligible Member of not less than 60 days and no[t] more than 90 days." Plan, App. L §1(A)(2), (Doc. 33 at PageID 933).

The first kit, mailed at the end of April, contained a 90 day election period consistent with the Plan, spanning from May 1, 2013 through July 29, 2013. By contrast, the second kit was mailed on July 10, and included a new deadline of August 28, 2013.[14] Including the days in which the second kit would have been in the possession of the postal service, the second election period reflected – at most - 49 days. Because a 49 day period is less than the minimum 60 day lump-sum election period expressly required by the Plan, the second kit failed to comply with Plan language, even if appropriate notice concerning its purpose had been provided. Defendants' argument that the 49-day period was adequate and that the Committee retained discretion to set any time period it wished for the second election period fails. The referenced Plan language permits an extension of up to twelve months, but does not permit the Committee to shorten the period to fewer than 60 days.

Defendants alternatively argue that – if combined with the time period of the first election kit - the total period afforded to Lehman by the second election kit exceeded 90 days and/or was permitted by the referenced "discretion" that the Committee retained to alter the Lump Sum Window time frame. From the first period beginning on May 1, 2013

---

[14]The August 28, 2013 deadline selected by the PLSIC (not the Committee) for the return of the second election kit was outside of the August 1, 2012 - July 31, 2013 time frame defined in Appendix L of the Plan.

through the end of the second deadline on August 28, 2013, Ford reasons that Lehman had "120 days *total* to consider whether to elect a lump-sum payment."   (Doc. 40 at 13, emphasis added).   However, that argument runs counter to Ford's claim that the first election kit was "invalid" and required Lehman to review and execute an entirely new second election kit.

Because Defendants provided no timely notice to Lehman, he was unaware of any decision that the first kit had been rejected or that the second kit contained either an "extension" of the first election period or an altogether new election period.   The inconsistency of viewing the two periods provided by the first and second kits as one long election period is borne out by Defendants' own arguments, which variously describe the 49 days allotted in the second kit as a "second election period." (*See, e.g.*, Doc. 17 at 11, 16, 17; Doc. 38-1 at 7; Doc. 40 at 10, 14).   It is unreasonable, to the point of being arbitrary and capricious, for the Defendants to insist that the first election kit was void, but then to deny the participant the minimal 60-day time period specified by the Plan to return a second election kit in a new election period.   By contrast in *Fife*, when Ford notified the participant of the rejection of his first kit and sent him a second kit, it also notified him that he was being moved to a second lump sum window.

Equally unreasonable was the Defendants' decision to deny Lehman's request for an extension of the deadline to return the second election kit after Defendants so belatedly notified him of the rejection of his first kit.   The Plan allowed the Committee for "administrative purposes" to permit an extension that did not "exceed 12 months in duration."   Even taking Defendants' view that a single election period began on May 1,

2013, Lehman's request for an extension through November 4, 2013 would not have exceeded "12 months in duration."

The Plan required the Defendants to treat Plan beneficiaries in a uniform manner. For the reasons previously discussed, the undersigned rejects the Defendants' argument that the Committee treated participant Lehman in the same manner as the "similarly situated" participant in *Fife* (Doc. 40 at 14).  Fife was not similarly situated, and the Committee did not treat the two participants in the same manner.   Additionally, in *Donati v. Ford Motor Co. General Retirement Plan*, 2015 WL 2405613, Ford sent a letter explaining that a correction in the kit was required (due to Ford's error) and that Donati was being moved to a later election period.   After Donati died, before she could return the corrected documents, Ford offered to accept Donati's first completed election kit as evidence of her intent, with distribution of the corrected amount.   *Id.* at *2.   In upholding Ford's decision not to pay a higher (erroneous) amount, the *Donati* court explained that while "Defendant's erroneous communications …were unfortunate and instilled a false expectation in Donati and Plaintiff," the Defendant's subsequent agreement "to pay exactly what Donati was entitled to under the Plan" was "consistent with its fiduciary duties" and adequate to affirm the benefits decision.   *Id.* at *5.   Defendants failed to treat Lehman and Plaintiff in a similar manner.

The undersigned also rejects the Committee's alternative argument that its failure to allow 60-90 days for return of the second election kit was "harmless" error.   Although a hypothetical second 90-day period would have expired on October 9, 2013 and Lehman did not submit the second election kit until November 4, Lehman cannot be faulted considering the Committee's abject failure to provide him with notice either that it was

rejecting the first kit or that he had any need to return the second kit.  Thus, the time provided for Lehman to return the second kit was unreasonably short, and the Committee's denial of Lehman's request to extend the period was arbitrary and caprcious.

### E.  Stated Reasons for Claim Denial

FNESC's January 17, 2014 "claim denial" letter stated that it was denying his request for payment of the lump sum benefit and "for an extension of the deadline to make a decision regarding the lump sum opportunity" because "a thirty day extension of the original deadline was provided" in the second election kit. (Doc. 33, PageID 487-488). The Committee confirmed that denial in its July 2014 letter, adding to the reasons provided by FNESC.

Plaintiff protests that the inclusion by the Committee of additional reasons in July 2014 amounted to an improper "post hoc rationale" for the earlier January 2014 FNESC decision.  However, the undersigned disagrees with any suggestion that, during the pendency of full administrative review, the fiduciary is bound strictly to the reasons provided upon initial review.   The type of "post hoc" rationale that is forbidden occurs not when additional reasons are fleshed out *during* the administrative process, but instead when there is a discrepancy between the position taken by the fiduciary during the administrative process, and the fiduciary's position after litigation is commenced.

Nevertheless, the undersigned agrees with Plaintiff that the additional reasons provided by the Committee in its July 2014 claim denial were unreasonable.  The Committee claimed it rejected the first election kit "to preserve the [plan's tax] qualified status, as required by [IRS] Code §1001(a) and 417…as permitted under Appendix L,

33

Section 1(C)(4) of the [plan]."  (Doc. 33, PageID 503).   In its motion for judgment, Defendants argue that IRS regulations require detailed and accurate disclosures regarding the amount of benefits available in various forms, and restrict the ability to distribute benefits without consent.   Defendants conclude that they were entitled to reject the first election kit, because to accept the first kit with its incorrectly stated lump sum might have been interpreted by the IRS as problematic.

However, the referenced Plan language provides for rejection of a claim only after communication from the IRS.   The first sentence of Section 1(C)(4) of the Plan specifies that "the Committee reserves the right to reject an application if the Internal Revenue Service communicates that such rejection is required to preserve the [Plan's] qualified status."  (Doc. 33, PageID 934).   Defendants' interpretation, that it may pre-emptively reject Plaintiff's application without any communication from the IRS, appears contrary to the natural reading of explicit Plan language. Defendants argue that the second and third sentences of Section 1(C)(4) permit the Committee broader discretion, by stating that "[a]n election…shall be effective only if the Committee does not reject [it]" and that "[t]he Committee may reject such an application before the commencement of …benefits." The Committee's interpretation defies logic.   The Plan provides a strict formula for the payment of benefits, and the election kit itself clearly stated that the Plan provisions control over any estimate provided in the kit.[15]

---

[15]Under the Committee's interpretation, the "estimate" language would be wholly superfluous since the Committee would be "required" to reject any election kit containing the most minor computational discrepancy.

**F.  Summary Plan Description Arguments**

As an alternative basis for finding in Plaintiff's favor, Plaintiff asserts that the Defendants failed to provide a Summary Plan Description ("SPD") as required under ERISA.  Plaintiff is mistaken.  Defendants have provided copies of the SPD and proof that they provided the SPD to Plaintiff's counsel months prior to the Committee's final denial of benefits.  (Doc. 40-1, Exhibit A, Doc. 40-2, Exhibit B).  Plaintiff concedes in his reply that counsel failed to "recognize the SPD in his files" and therefore failed to include it in the administrative record.

In his reply memorandum, Plaintiff asserts that the copy of the SPD provided by Defendants does not demonstrate that Ford timely and effectively distributed the SPD to Lehman.  However, the undersigned concludes that Plaintiff has effectively waived any arguments relating to the distribution of the SPD in light of Plaintiff's failure to seek its inclusion in the administrative record or to conduct additional discovery.  (*See* Minute Entry, July 14, 2015).

Based on waiver, the undersigned finds no need to address several of Plaintiff's additional arguments relating to the SPD language.  For example, Plaintiff relies upon SPD language to refute the existence of a Committee "rule" that Defendants allege authorized the rejection of the first election kit, and argues that the SPD lacked notice to support the Committee's reliance on IRS regulations to reject Lehman's first election kit. Similarly, Plaintiff argues that the SPD did not permit Defendants to "deem" the first kit "invalid" for any other reason.  Finally, Plaintiff asserts that the express SPD language "proves that if the election form is received …accompanied by a death certificate, the [lump sum] amount will be automatically recalculated."   (Doc. 42 at 8).

35

### III. Conclusion and Recommendation

For the reasons stated, the undersigned has concluded that the "de novo" standard of review should apply, but that the claim decision should be reversed even under the far more deferential "arbitrary and capricious" standard of review.

When a benefits plan is found to have acted in violation of the appropriate standard of review, a court has two options: (1) to award benefits to the claimant, or (2) to remand to the plan administrator.   *See Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 551 (6th Cir. 2015).   Here, it is clear that the Plaintiff is entitled to the award of Lehman's lump sum benefit.   However, because it is not entirely clear that the second kit contained an accurate figure, and because Lehman continued to receive a monthly annuity until the date of his death, it is appropriate to remand for re-calculation of the lump sum to be awarded.

Accordingly, **IT IS RECOMMENDED THAT** Plaintiff's motion for judgment on the record (Doc. 37) be GRANTED and that Defendant's motion (Doc. 38) be DENIED. Further, this Court should remand to the Plan for the calculation and award of a lump sum benefit to Plaintiff.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BILLIE L. BUMGARNER,                                    Case No. 1:14-cv-788

                  Plaintiffs,                      Dlott, J.
                                           Bowman, M.J.

        v.

FORD MOTOR GENERAL RETIREMENT
PLAN, et al.,

                  Defendants.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.   That period may be extended further by the Court on timely motion by either side for an extension of time.   All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.   A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.   Failure to make objections in accordance with this procedure may forfeit rights on appeal.   *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).